THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARSHALL JONES *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—90—2562, 1—90—2843 cons.

Opinion filed September 28, 1992.

Michael J. Pelletier and James E. Chadd, both of State Appellate Defender's Office, of Chicago, for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James F. Fitzgerald, and Andrew R. Dalkin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MANNING delivered the opinion of the court:
Defendants Jerry and Marshall Jones were charged by indictment with murder, armed robbery and burglary. Defendants were tried separately but simultaneously before two juries. Jerry Jones was convicted of all three counts and Marshall Jones of all charges, except the burglary charge. Defendant Jerry was sentenced to an extended term of 80 years, and defendant Marshall was sentenced to an extended term of 75 years.

On appeal defendants argue that: (1) they were denied a fair trial because the jury was allowed to view a close-up photograph of the decedent's blood-covered face; (2) that the court erred in finding that their conduct was exceptionally brutal and heinous, indicative of wanton cruelty; and (3) that the sentencing mittimus must be amended to reflect credit for time served while in custody from the day they waived extradition from Tennessee to Illinois.

The following testimony was adduced at trial. Betty Brown testified that she was the owner of "Betty's" lounge located on Clark Street in Chicago. Brown lived in an apartment on the second floor above the lounge. She testified that John Hood, the decedent, was employed as a bartender at the lounge on December 25, 1985. Brown stated that she made two trips from her apartment to the lounge on that date, at 5 p.m. and 9:45 p.m. There were no patrons in the lounge at 9:45 p.m., and Brown advised decedent that he could close the lounge at midnight if business did not pick up. She stated that at 2 a.m. the following morning she received a telephone call from the Chicago police, walked downstairs to the lounge with her husband, where they saw the decedent lying on the floor in a pool of blood. Brown testified that the cash register, money and liquor were missing from the lounge.

Carlos Bauer testified that on the morning of the incident he returned from a Christmas party and walked down Clark Street on his way to "Betty's" to purchase cigarettes. He saw his neighbor, Miguel Biluje, leave "Betty's" with another man, and one of the two told Bauer that the bartender had been shot and that the police had been called. Bauer ran into "Betty's," where he saw the decedent's body lying on the floor. Bauer exited the bar and flagged down a police car.

Chicago police officer Timothy Hickey testified that he arrived at "Betty's" lounge about 1 a.m. on December 26, 1985. He entered the lounge, where he observed the decedent lying behind the bar. Hickey stated that he observed stab wounds in the decedent's back and blood in the area where his body lay. The cash register was missing, and a bar stool was tipped over inside the lounge. There were also red footprints on the floor.

Richard Mariner, a Chicago police detective, testified that he was called to the scene of the homicide on December 26, 1985. He interviewed four persons there and none of the four had blood on them. Detective Mariner also stated that he went to Tennessee to bring defendants back to Illinois for trial. They returned to Illinois on April 27, 1988. He testified that en route from Tennessee defendant Jerry stated that whatever defendant Marshall told him was exactly what happened on the night of the incident.

Sharon Tate was married to defendants' brother, Carl Jones. Sharon and Carl lived in an apartment near "Betty's" lounge. Sharon testified that about 6 p.m. on December 25, 1985, defendants came by their apartment, left the apartment shortly thereafter, and returned to the apartment at about 10 p.m. that evening. They

left the apartment a second time and returned at about 1:30 a.m. Carl opened the door and defendants and Carl began talking in the kitchen. Carl later asked Sharon to bandage defendant Marshall's leg. Sharon testified that, while in the kitchen, she observed blood on the defendants' pants and boots, and observed a cash register on the stove and liquor bottles on the sink. There was also a cash register receipt with "Betty's" lounge printed on it. She stated that these items were not in the kitchen before defendants came to the apartment.

Sharon testified that she heard Jerry say, "All this for a little of nothing—All this shit for little of nothing." She observed a puncture wound in Marshall's left leg. Sharon testified that Jerry changed his clothes and placed the old clothes into a duffel bag. The defendants also placed the cash register drawer and the liquor bottles in the bag.

Sharon testified before Marshall's jury that she asked Marshall why they had committed the crime and Marshall replied that he would receive 40 years and that Sharon would never see him again. Sharon further testified that Marshall wrote several letters to her. She claimed that the first letter asked her to avoid being found so that she and Carl would not have to testify in court. In a second letter he instructed Sharon to keep all letters that he wrote her, and a third letter instructed Sharon not to appear in court.

Carl Jones, brother of the defendants, testified that at about midnight on December 25, 1985, defendants came to the back door of his apartment with a plastic garbage bag. Carl stated that defendant Jerry stated "Do you want to kick my ass now or later," and that they had "fucked up." The defendants removed a cash register drawer and liquor bottles from the bag. Jerry placed the cash register drawer on top of the stove and counted the money. Carl stated that Jerry said the money totaled only $100 or $200, which was not worth the trouble they were in. He also testified that Jerry stated the defendants had robbed a bar and stabbed the bartender and that he believed the bartender was killed. Carl testified that defendants' clothes were full of blood and that they changed clothes, packed their soiled clothes in a duffel bag and left the apartment.

Carl testified before defendant Marshall's jury that Marshall had blood on his pants when he came into the kitchen and that Marshall told him that he had "messed up" and stabbed the bartender at "Betty's." Carl stated that he saw Jerry count the money, after which Marshall stated, "It wasn't worth the trouble." Carl

also observed both defendants with knives that they took with them when they left the apartment. He stated that he saw a cut on Marshall's left leg and asked Sharon to assist with the injury.

Dr. Choi, assistant Cook County medical examiner, testified that he performed an autopsy on the decedent. He stated that decedent's cause of death was multiple stab wounds and blunt trauma. He testified that while there were abrasions on decedent's elbows, there were no other signs of defense wounds on his arms, hands or fingers. Dr. Choi also testified that the trauma depicted in the photographs during trial were consistent with a foot kicking on the body.

During trial the court allowed the State to enter into evidence a photograph that graphically depicted the injury to decedent's head. Defense counsel objected to the admission of this evidence. The court overruled this objection.

At the close of trial, the jury for Jerry Jones found him guilty of murder, armed robbery, and burglary. The jury for defendant Marshall Jones found him guilty of murder and armed robbery. At Jerry's sentencing hearing, the court found that the offense was accompanied by exceptionally brutal and heinous behavior and sentenced him to an extended term of 80 years' imprisonment on the murder conviction, 30 years for armed robbery, and 7 years for burglary.

At Marshall's sentencing hearing, the court also determined that the offense was accompanied by exceptionally brutal and heinous behavior and sentenced Marshall to an extended term of 75 years for murder and 30 years for armed robbery. Both defendants' sentences were to run consecutively with any sentences they were serving in Nashville. This appeal followed.

Defendants first argue that they were denied a fair trial because of the State's introduction of a photograph of the decedent into evidence. They assert that the photograph of the decedent's bloody head had no probative value and was, therefore, prejudicial.

Whether or not a jury is allowed to see photographs of a decedent is a decision made by the trial court in the exercise of its sound discretion. (*People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.) If the photographs are relevant to prove facts at issue, they are admissible and can be shown to the jury unless their nature is so prejudicial and so likely to inflame the jurors' passions that their probativeness is outweighed. (*People v. Henderson* (1990), 142 Ill. 2d 258, 568 N.E.2d 1234.) When a defendant in a murder trial pleads not guilty, the prosecution is allowed to prove every ele-

ment of the crime charged and every relevant fact, even if the defendant offers to stipulate to those same facts. (*People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208.) While the photographs may be cumulative of the testimony of a witness who described the condition and location of the body, they may also aid jurors in understanding this testimony. *People v. Williams* (1983), 97 Ill. 2d 252, 292, 454 N.E.2d 220; *People v. Greer* (1980), 79 Ill. 2d 103, 117, 402 N.E.2d 203.

Defendants maintain that because there was no dispute as to the amount of blood found on the decedent's body, and because there were pictures other than that which showed a close-up view of the decedent's head wound and the pool of blood, the picture was offered to inflame the jury. The State maintains that the picture was relevant to show the placement and extent of the decedent's wound to the head and the amount of blood present at the scene of the crime. The State also contends that the photograph corroborated the testimony of the medical examiner.

■ While there may have been another picture which the State could have used with less graphic impact, we cannot say that the defendants were denied a fair trial by the admission of the photograph into evidence. The State asserted that the picture was used to show relevant factors related to the injury decedent suffered. Photographs that are relevant to establish any fact in issue are admissible in spite of the fact that they may be of a gruesome or disgusting nature. (*People v. Lucas* (1989), 132 Ill. 2d 399, 548 N.E.2d 1003.) Therefore, we cannot say that the decision to submit the photograph to the jury was an abuse of discretion.

Defendants next argue that the trial court erred in finding that their conduct was exceptionally brutal and heinous. Specifically, they contend that their intent was not to murder the decedent, that they expressed regret that the decedent was killed, and that the murder occurred only after the decedent resisted the robbery and fought back.

In *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344, the Illinois Supreme Court held that the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" must be given its ordinary and popularly understood meaning. The court defined "heinous" as being "hatefully or shockingly evil: grossly bad." "Brutal" was defined as "grossly ruthless, devoid of mercy or compassion: cruel and cold-blooded." *La Pointe*, 88 Ill. 2d at 501.

Defendants cite to *People v. Andrews* (1989), 132 Ill. 2d 451, 548 N.E.2d 1025, for the proposition that where remorse is ex-

pressed and where there was no intent to kill a victim, the court should not impose an extended-term sentence. In *Andrews*, the Illinois Supreme Court stated that every murder by nature is unnecessary, and that section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 5—5—3.2(b)(2)) requires that the murder be "exceptionally" brutal or heinous before an extended term should be imposed on a defendant. The court explained that section 5—8—2 of the Unified Code of Corrections was not intended to convert every offense into an extraordinary offense subject to an extended term.

In that case, the defendants, who had planned to commit armed robberies, shot and killed one victim while inside his car. After climbing into the car, one defendant placed a gun to the victim's head and shot him at close range. During the sentencing hearing, the defendant expressed remorse and explained that he never intended to kill anyone. In finding that the trial court abused its discretion in sentencing defendant to an extended term, the supreme court reversed, stating that there was no evidence in the record that defendant indicated prior to the crime that he intended to kill the victim or that he exhibited a callous attitude and complete lack of remorse following the murder. *Andrews*, 132 Ill. 2d at 466.

In addition to *Andrews*, defendants cite three cases wherein they contend that the defendant's behavior was more egregious than theirs, but where the court held that the crime was not accomplished by brutal or heinous conduct. (*People v. Bedony* (1988), 173 Ill. App. 3d 613, 527 N.E.2d 916 (where defendant arranged a meeting with his girl friend's husband under false pretenses, then went to the man's home taking a gun and a metal pipe with him; when the husband turned his back, the defendant repeatedly hit him over the head with the pipe and then fired four shots, one of which hit the victim in the head); *People v. Holiday* (1985), 130 Ill. App. 3d 753, 474 N.E.2d 1280 (where the defendant, during the course of an armed robbery, entered a room occupied by a number of people, including several small children, shot four people killing one of them, although the robbery was unresisted); *People v. Price* (1987), 158 Ill. App. 3d 921, 511 N.E.2d 958 (where a prostitute, after having placed a knife within easy reach, stabbed her intoxicated, unarmed customer in the neck four times and fled, leaving the victim bleeding to death).) Defendants argue that, in comparison to the authorities cited, their conduct was not so egregious that the trial court should have imposed extended-term sentences. They dispute the trial court's summation that the decedent was held and tor-

tured, arguing that there was no evidence in the record from which the court could make that conclusion.

■ When reviewing whether a defendant's sentence is excessive, the entire spectrum of facts surrounding the incident must be analyzed and evaluated; each case on its own particular facts and circumstances. (*People v. Bishop* (1989), 179 Ill. App. 3d 99, 103, 534 N.E.2d 401.) Here, the court provided an explanation for its action in sentencing defendants to extended terms. The court explained that the decedent had been held by one defendant and tortured with a knife by the second defendant. The court also explained that it felt defendants put the knife into decedent to induce him to come up with the money. Since the trial court heard the evidence and viewed the witnesses as they testified, it was in a superior position to make reasonable inferences therefrom. Based upon that superior position, the trial court is best able to determine an appropriate sentence, and absent a clear abuse of discretion, a reviewing court will not reverse that determination on appeal. (*People v. Perruquet* (1977), 68 Ill. 2d 149.) We find that the court considered the proper aggravating factors in determining that defendants' conduct was exceptionally brutal. Therefore, we are unable to find that the trial court abused its discretion by sentencing defendants to extended terms.

Defendants' final argument is that they are entitled to have the mittimus corrected to reflect credit for the time they served in custody from the day they waived extradition from Tennessee to Illinois.

In *People v. Gardner* (1988), 172 Ill. App. 3d 763, 527 N.E.2d 153, the defendant was arrested in Arkansas because of murders he committed in that State. A detainer was lodged against him and he waived extradition from Arkansas to Illinois for charges in Illinois. The appellate court, in remanding the case for the purpose of determining when the defendant was held in Arkansas for the Illinois charges, stated that it could not determine the proper sentencing credit to be given defendant. The facts in *Gardner* are similar to the facts here.

In the instant case, defendants asserted that they waived extradition on April 20, 1988. The record reflects that there was some confusion as to that date:

> "THE COURT: Did he fight extradition at any time?
>
> Mr. Sincox [Defense Counsel]: No. He waived it from day one as soon as they chose to initiate it.
>
> THE COURT: When did you file your extradition papers?

Mr. Goodfriend [Assistant State's Attorney]: Judge, we might be able to get that information.

THE COURT: I think that is the key date."

Based on this colloquy, the court here determined that the key date was the date the State filed its extradition papers. As in the *Gardner* case, once the date was established the defendants were given credit from that date. It is clear that the mittimus should be corrected to give defendants credit from the date that they waived extradition.

Accordingly, the judgment of the circuit court of Cook County is affirmed in part and remanded in part.

Affirmed in part and remanded in part.

BUCKLEY, P.J., and CAMPBELL, J., concur.