THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CORNELIUS WASHINGTON, Defendant-Appellant.

First District (2nd Division)   Nos. 1—90—2220, 1—90—2590 cons.

Opinion filed February 9, 1993.

Michael J. Pelletier and Maria A. Harrigan, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Donna C. Leak, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

A jury convicted defendant Cornelius Washington of first degree murder, aggravated criminal sexual assault, and home invasion. He was sentenced to natural life in prison for the murder, with concurrent 60-year sentences for the other two crimes. Defendant contends in this appeal that he did not receive a fair trial because (1) the prosecutor commented, without substantiation, that the reason the State's witnesses did not come forward immediately and their testimony differed from their initial statements to police was that they were afraid of defendant; (2) the circuit court abused its discretion by summarily denying the jury's request for a transcript; and (3) the circuit court abused its discretion by admitting into evidence graphic photographs of the victim. For the reasons that follow, we affirm.

At trial, Anthony Morrison testified that on July 19, 1988, he lived with his wife in a courtyard building in South Shore in Chicago, in an apartment one floor above that of Mae Brabbs, the victim in this case. That day, he and his long-time friend, Brian Cobbins, worked for a nearby plumbing concern until 5 or 5:30 p.m. After work, the two men stopped at a liquor store and then went to Morrison's back porch. When Morrison was opening his second or third beer, defendant arrived and began drinking with the two men. Later, two other men, Edward Reed and then Fred Neal, came by. While the men sat on the bottom steps of the back porch, drinking and talking, the victim came out of her apartment with her dog; the men rose to let her pass. When defendant made a comment about robbing her,

Morrison asked him "what was wrong with him, why would he bring that to me, and where I have to live." Defendant responded by hitting Morrison in the chest. Morrison then went upstairs to his apartment, leaving defendant and the other three men. He took a shower and lay down on the couch, where he fell asleep. By his estimate, he had consumed "[a]bout 4 cans of beer, and maybe close to about half pint of wine."

Morrison was awakened by his wife, Wanda, when Reed came to the front door, saying "I think [defendant] done something to that woman." Morrison sent Wanda to knock on the victim's front door. When she returned after receiving no response to her knocking, Morrison fetched the building janitor, William Walker, who was standing in a gangway between the buildings. Morrison, his wife, and Walker went to the rear of the victim's apartment and entered through the open door. They saw the victim lying across the bed with her clothes up over her head. Morrison went to his apartment to call police, as did Walker. Morrison admitted being a heroin user, but he denied having used heroin on the day of the murder. Wanda Morrison gave substantially the same testimony.

Brian Cobbins testified that a short time after Morrison went upstairs to his apartment, he too headed up to Morrison's apartment to see if the latter was coming back. About halfway up the stairs, he heard a gurgling noise from the first floor. He went back downstairs. Only Reed and Neal were there, and all three men left. He did not call the police because he was scared and did not want to get involved; instead, he went home and went to sleep. On cross-examination, he testified that the only liquor he saw were the two 40-ounce bottles of beer he had bought at a liquor store and brought to Morrison's building and that Morrison drank wine, not beer.

Frederick Neal testified that a few minutes after he arrived at Morrison's building, he went with defendant to the nearby liquor store and bought a six-pack of beer. About 30 minutes later, Morrison went upstairs after arguing with defendant for about five minutes. Neal had not heard what the disagreement was about, nor had he seen either man strike the other. After Cobbins also had gone upstairs, defendant began scratching on the transom at the victim's back door. The victim came out of her apartment and asked what he was doing. Defendant replied that he was the landlord's son and had to make some repairs. Defendant then lunged at her, put his hands around her neck, and forced her into her apartment; Neal heard her scream once. Cobbins returned and suggested they leave. Neal then went to his mother's house, where he stayed for about an hour. He

then went home. The next day, after he learned of the victim's death from the television news, he asked his sister to call the police. He himself did not call because he was upset.

Edward Reed recounted running into Morrison, Cobbins, and defendant, and then going to a liquor store with them to buy beer and wine. At first, they went into the alley and drank, then they went to the back stairs at Morrison's building. Neal arrived sometime later. After the victim went out to walk her dog and returned, defendant said he was going to "tak[e] off the old lady." After Morrison went upstairs, the victim came out and stood in her doorway talking to defendant, who then entered her apartment with his arms extended. Reed heard the victim scream, but he went home. When he returned to the building, Morrison's wife answered the door and woke Morrison. Reed told Morrison that he saw defendant go into the victim's house. Initially, he did not tell police about the incident because he did not want to become involved.

Margarita Arruza, a former Cook County medical examiner, performed the autopsy on the victim. In her opinion, the cause of the victim's death was strangulation. She also described the victim's extensive injuries: fractured nose; bruises on her eyes, cheeks, nose, chin, chest, arm, legs, and near her lips, consistent with being beaten; small hemorrhages at the base of the neck, consistent with strangulation; and lacerations around and inside the vagina, consistent with forcible penetration. By stipulation, however, J. Richards, an evidence technician for the police, testified that tests on a vaginal swab taken from the victim did not indicate the presence of semen.

Detective Edward Kevin was assigned to investigate the victim's murder and arrived at her home at approximately 8 p.m. He first saw her lying face up on her bed, wearing a pink and white housecoat that had been pulled down, exposing her breasts, and pulled up, exposing her genitalia. On the bed was a travel pouch, a purse, and a pair of eyeglasses; a hammer was on the floor nearby. He then spoke with the Morrisons for about 45 minutes; Morrison appeared to be "highly intoxicated." Kevin went to the local firehouse and talked with a fire lieutenant,[1] and then he returned to the crime scene, where he remained for about 45 minutes. While there, he received information indicating that defendant was wanted for the victim's murder. He went to the house of defendant's mother, explaining to her that the police

---

[1] Although no evidence was introduced on this point, someone apparently had called the paramedics, who may have tried to revive the victim.

were looking for defendant in connection with a homicide. Kevin and his partner then went to the homes of Cobbins, Reed, and Morrison to ask each to assist in the investigation. Each man agreed, so he took them to the police station. Until about 6 a.m., he and his partner interviewed the three men: Kevin interviewed Reed; his partner interviewed Cobbins and Morrison. After these interviews, Kevin contacted the State's Attorney's felony review unit, but the unit would not authorize a murder warrant against defendant. Later that day, Kevin looked for defendant but was unable to find him.

Chicago police officer Mark Bandyk testified that he was on routine patrol on July 19, 1988, at about 7:30 p.m. when he received a call to assist at a homicide scene. He and his partner entered through the back door of the victim's two-room apartment and saw her lying on the bed, wearing a housecoat that had been torn open to reveal her breasts; her lower body was covered with a red blanket. Her face had been badly beaten and there was a lot of blood. On cross-examination, he agreed that according to his report, Morrison had told him that he and Walker, the janitor, had been drinking for an hour or two on the back stairs.

On July 23, Officer Bandyk received a telephone call from Morrison and then went to Neal's home to ask him to assist in the investigation. Before returning to the station with Neal, Bandyk picked up Cobbins to reinterview him; he also called Reed, who met him at the station. Bandyk interviewed Neal for approximately an hour and spoke separately with Reed for about 30 minutes. Bandyk again contacted the felony review unit, and an assistant State's Attorney arrived at the station. After interviewing Cobbins, Neal, and Reed, the assistant State's Attorney took statements from them, which she handwrote and they signed. In September 1988, Bandyk went to Louisiana to extradite defendant.

On cross-examination, Bandyk agreed that according to his first report, Morrison said on July 19 that he was unemployed. In addition, Morrison had not mentioned Neal being at the building that day, nor had Morrison recounted defendant's "ripping off" comment and the resultant altercation until Bandyk brought Morrison, Reed, and Cobbins to the station for questioning. According to the report, Cobbins too initially had said he was unemployed and that when he went back down the steps after having gone to Morrison's apartment for a drink of water, he heard a gurgling sound from the victim's apartment and he then went home and went to sleep. Also according to his report, Reed initially had said that he and Cobbins left after Morrison went upstairs, and that defendant was still sitting on the steps by the vic-

tim's door. Too, Wanda Morrison had not mentioned that Reed had come to the Morrison apartment. Bandyk conceded that he had not verified Cobbins' employment.

William Walker testified that he was a teacher and that he had worked for the Chicago Board of Education for 23 years. He was a part-time janitor in the victim's building and had lived across the hall from her since 1970. On the evening of the murder, he was mowing the grass when Morrison called to him. The two men went to the victim's back door, which was unlocked. They entered the apartment and he saw the victim lying on her back on the bed with the upper and lower parts of her body unclothed. He ran to his apartment and told his wife to call the police.

Defendant testified next. On July 19, 1988, he had a full-time job as a carpenter and was living with his sister and his fiancee. Six months prior to that date, he had pleaded guilty to criminal damage to property because "[he] did that crime." He had been sentenced to five months in jail plus two years' probation, and he had been released two months before the murder. He had known Cobbins and Reed for about 20 years, and Neal for about 15 years. He said that Morrison and Cobbins did not work and that, for the 20 years they had known one another, Morrison had been a heroin user. Defendant conceded, however, that he had not seen Morrison using heroin on the evening of July 19th nor had Morrison told him he had done so, but defendant stated that he knew Morrison to "shoot up" early in the morning.

Defendant testified that on July 19, at about 5 p.m., his sister had given him a ride to Morrison's neighborhood because he was going to Reed's house nearby to get a ride to his mother's home. When he arrived, Morrison was "very high" and was drinking wine; Cobbins was drinking from a large bottle of beer; Reed arrived 5 or 10 minutes later. He denied that Neal was there at any time.

Defendant had no alcohol with him, so he asked Cobbins for some of the beer, offering to buy more when it was finished. Five minutes after Reed arrived, defendant and Reed went to the store, and both men paid for two fifths of wine. When they returned from the store, they stood "by the corner alley of the building." Morrison was running up to his apartment every few minutes and returning a few minutes later; he eventually told the others that he was going to sit on the steps. Cobbins joined Morrison on the steps, and defendant and Reed stood near the fence a few feet away.

While the four men were there drinking the wine, the victim and her dog came out of her apartment's back door, and Cobbins and

Morrison got up to let her by. After she went toward the parking lot, Morrison nudged defendant's arm, whispering "That's the lady I be get money from so I could go buy dope"; Reed was standing on the other side, so he could not hear the comment. Defendant responded "what you telling me, sir, I don't want to know about, you know, your problems." Morrison also told him that he and Cobbins were planning to rob the victim. When the victim returned about 10 minutes later, Cobbins and Morrison exchanged glances. Then Cobbins "went up to the lady's door [and] was pecking on the lady's glass," and Morrison stood up. At that point, defendant left for his mother-in-law's house seven blocks away; Reed had already left.

Defendant arrived at his mother-in-law's house about 7 p.m. and stayed approximately 30 minutes. He then went home, stayed only long enough to ask his sister where his fiancee was, and then went to another family member's home, where he found his fiancee. At 10 or 10:30 p.m., defendant called his mother, who told him that the police had come by her house looking for him in connection with a murder. He assured her that he did not commit the murder but told her that he would soon leave town. He explained that he went to Louisiana that night because he "didn't want to blow [his] probation" for the January conviction. There, he found a job to earn money so that he could return to Chicago and hire a lawyer to defend him. After his extradition, defendant talked with the assistant State's Attorney for approximately 30 minutes, but he denied telling her he had had no money on the day of the murder and that his friends had been obliged to buy him liquor. He also denied participating in any of the charged crimes.

Anna Demacopoulos, an assistant State's Attorney, testified that in September 1988, she was assigned to the felony review unit and interviewed defendant after his extradition. Defendant told her that his companions had supplied all the liquor that day because he had no money, but she conceded that this information was not in her handwritten notes made just after the interview.

After all the witnesses had testified, the State moved to publish its exhibit Number 1, a large, color close-up photograph of the victim's face, showing severely blackened eyes and facial abrasions as well as indications around the neck of the strangulation. The State argued that the photo was necessary to show the elements of force and bodily injury in the charges of sexual assault and home invasion. Defendant's attorney objected on the ground that the photo had no probative value because there was no issue as to the extent of the injuries, and he claimed that the photograph "is designed to set this

jury on fire." The court commented that the photo corroborated the witnesses' accounts of the victim's condition when they first saw her, and it agreed to publish the photo. Defense counsel strenuously objected, characterizing the photo as "extremely prejudic[i]al" and "unnecessary under the circumstances." Claiming that the State was "trying to bootstrap this case up by using a photograph like this to inflame the jury," he then moved for a mistrial, which the court denied.

Except exhibit Numbers 7 and 9, both of which show the victim lying on the bed with a red blanket over her lower body, the State's other exhibits were admitted without objection or were withdrawn. Defendant objected to the admission of these photos on the ground that the victim's body was not as it was when the Morrisons and Walker first saw her because paramedics had tampered with the scene at least by placing the blanket on the victim and none of the three had authenticated the photos. Having excluded as prejudicial exhibit Number 10, in which the lower half of the victim's body was unclothed, the court allowed publication of the two photos with the blanket covering the victim's lower body.

Defendant then renewed the objection to exhibit Number 1 on the ground that the photo was taken by the coroner at the morgue, not at the scene, and that other pictures subsequently admitted over his objections were sufficient to depict the injuries. Defendant also objected because Dr. Arruza had not mentioned the victim's black eyes, comparing the resultant undue prejudice to that which would follow from pictures of an autopsy showing internal injuries. The court stated that the photo corroborated the testimony of Dr. Arruza and that defendant could explain the photo as having been taken at the morgue. The court added that the probative value of exhibits 7 and 9 lay in their showing the purse, bag and glasses. Defendant then objected to using both pictures as cumulative. The court agreed that the photos depicted the same scene from different angles, but it ruled that they were not cumulative.

In its closing argument, the State commented that the Morrisons, Neal, Reed, and Cobbins had no reason to lie and say that defendant committed the crimes, and that no reason had been alleged. Defendant, in his closing, disagreed, pointing to the inconsistencies between their first statements to the police and their testimony at trial and arguing that they had every reason to lie because Cobbins and Morrison had committed the crimes. In rebuttal, the State characterized its witnesses on July 19 as "covering up for [defendant], when they didn't want to get involved, when they were afraid of [defendant]." Defend-

ant objected that the argument was based on facts not in evidence, but the court replied "Counsel may argue." The prosecutor then continued: "When they're afraid of [defendant], they covered up for him ***."

During deliberations that afternoon, the jury sent out a note, asking: "If possible: 1) Please supply us with a copy of the transcript." The court replied, "I am going to answer the note as follows: 'March 30, 1990, you have heard the evidence and received all exhibits. Please continue to deliberate, Judge Morrissey.' " The record does not reveal who was in the courtroom when this occurred.

The jury found defendant guilty of first degree murder, aggravated criminal sexual assault, and home invasion. Although it also found him eligible for the death penalty, it did not impose it. Defendant filed a post-trial motion, which the court denied. Defendant received the sentences previously indicated.

## I

Defendant's first challenge on appeal is that he was denied a fair trial when, during closing argument, the prosecutor improperly attempted to explain the inconsistencies between its witnesses' first statements to the police and their testimony at trial as the result of their fear of him. Absent evidence in the record that defendant had threatened these witnesses, he contends, the circuit court erred in overruling his objection to the prosecutor's statement, which the prosecutor then repeated. Such comments were especially improper, he insists, because suggestions that witnesses were afraid to testify because of threats by a defendant are "highly prejudicial and inflammatory." Even though he did not raise the issue in his post-trial motion and thus may have waived the issue, he concludes, this court should consider it as plain error under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)). Because the case was a credibility contest and the testimony commented upon was the only evidence against him, defendant urges this court to find that the prosecutor's behavior prejudiced him, warranting a new trial. Although the inference that the witnesses did not want to become implicated or involved is supported by the evidence, the record contains no evidence to support the State's inference that defendant threatened the witnesses or that they feared him. Even if the altercation between Morrison and defendant occurred, he continues, it would not explain the reluctance of the other witnesses to come forward. He emphasizes that improper prosecutorial argument is overlooked only if made in response to a defendant's own improper argument, citing *United States v. Young* (1985),

470 U.S. 1, 84 L. Ed. 2d 1, 105 S. Ct. 1038 (interpreting Fed. R. Crim. P. 52(b)). Unlike his counsel's comments, which were inferable from the evidence, the State's comment implied without supporting evidence that defendant somehow had caused the witnesses to fear him. In addition, he argues, the case was a close one, resting on a balancing of the credibility of the witnesses at issue against that of defendant.

Although to preserve an issue of prosecutorial misconduct for direct appellate review, a defendant generally must make both a contemporaneous objection and a written post-trial motion including the objection (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274), under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) a defendant may invoke the plain error rule on direct appeal if the evidence is closely balanced or the error was so substantial that it denied a defendant a fair trial. (*People v. Speight* (1992), 153 Ill. 2d 365, 379 (circuit court's *sua sponte* taking judicial notice of facts after close of evidence was error, but harmless because no prejudice resulted and evidence against defendant was overwhelming); *People v. Mullen* (1990), 141 Ill. 2d 394, 401-02, 566 N.E.2d 222, 228 (argument that witnesses were reluctant to testify due to fear of being shot met either test, even though defendant confessed to the crime, after court warned prosecutor not to comment on witnesses' refusal to answer questions the day before).) When the evidence is closely balanced,

> "[t]he main purpose of the plain error rule *** is to protect against the 'possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved' for appellate review. [Citation.] In cases where the evidence is closely balanced, the probability that a defendant's conviction was caused by even a minor trial error is greatly enhanced. Therefore, in those cases, the court will invoke the plain error rule so that it can determine whether the error, which was not objected to at trial and in post-trial motions, raises doubt as to the validity of the jury's verdict." (*Mullen*, 141 Ill. 2d at 402, 566 N.E.2d at 226.)

When the error alleged is constitutional, it is considered harmless if shown to be harmless beyond a reasonable doubt. (*People v. Shields* (1991), 143 Ill. 2d 435, 446, 575 N.E. 2d 538, 543, citing *Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828.) For this appeal, we assume without deciding that the plain error analysis is appropriate.

With regard to alleged errors in closing argument in particular, the circuit court's decision as to the propriety of an argument should be affirmed unless an abuse of discretion is obvious. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 445-46, 521 N.E.2d 38, 57, *cert. denied* (1988), 488 U.S. 871, 102 L. Ed. 2d 156, 109 S. Ct. 187.) Moreover, when reviewing the ruling here, we are mindful that

"[p]rosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant. [Citation.] The court must consider the context of the argument, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. [Citation.]

It is improper to argue that a witness is afraid to testify because he has been threatened or intimidated by defendant when not based upon evidence produced at trial." (*People v. Walker* (1992), 230 Ill. App. 3d 377, 400, 594 N.E.2d 1252, 1267 (no prejudice in remark that witness was risking his life to testify because the remarks were not highlighted, repeated or otherwise emphasized), *appeal denied* (1992), 146 Ill. 2d 649, 602 N.E.2d 473.)

Although *Thompkins* and the other cases cited above concern remarks about a witness' fear of testifying at trial, we believe that this analysis also may be used when, as here, the challenged remark instead is offered to explain a witness' reluctance to come forward initially or to speak truthfully during the early stages of a criminal investigation.

■■ Here, the State presented no direct evidence that defendant ever had threatened or physically harmed any of the witnesses, other than the blow to Morrison, and both Cobbins and Reed expressed fear of becoming involved in the case generally, not fear of defendant. As for the context of the challenged comment, in her opening argument, the prosecutor stated that the witnesses had no reason to lie and name defendant as the perpetrator. Defense counsel countered in his argument that their reason to lie was that Morrison and Cobbins had committed the crimes, and that their credibility was undermined by, among other things, their initially inconsistent statements, which grew more similar as the days passed. In rebuttal, the other prosecutor explained the witnesses' initial untruthful or incomplete statements as the result of the witnesses' "covering up for" defendant, not wanting to get involved, as well as their fear of him, and he repeated the latter remark after the court overruled defendant's objection.

With no physical evidence, or circumstantial evidence other than his flight to Louisiana, linking defendant to the crimes, his conviction

rested on their testimony alone. As in *Walker*, however, the remark here was neither highlighted, repeated (other than just after defendant's objection was overruled), nor otherwise emphasized. In *Mullen*, in which the supreme court found plain error when a prosecutor commented on a witness' initial reluctance to testify after the trial court had admonished the prosecutor not to make any reference to it, the prosecutor speculated that the witness did not want to testify at trial because he "did not want [a bullet] in [his] back," and the sole evidence of fear in the record was that the witnesses were afraid only at or near the time of the incident, not at trial. Here, by contrast, there is no such egregious disregard of a court order, nor graphic description of the reason for the fear, nor comment concerning fear at trial when the only evidence of fear concerned the time of the murder. Furthermore, in *Mullen*, the court found that prejudicial error had occurred because the evidence was closely balanced and "littered with discrepancies" (141 Ill. 2d at 407, 566 N.E.2d at 228-29), whereas here the testimony of the witnesses was consistent with one another even though it differed from their initial statements to police. As a result, unlike the court in *Mullen*, we cannot say that it is probable that the remark here influenced the jury and may be the reason for its verdict.

Similarly, we find distinguishable *People v. Smith* (1990), 141 Ill. 2d 40, 66, 565 N.E.2d 900, in which the court found reversible error when, among other things, the prosecutor commented after evidence of gang-related activity and motive, "every witness that had the guts to come in here and say what he or she saw, every witness that had the guts to point the finger at this defendant, every witness that had the guts to tell the police this is the guy, has had to leave town" even though no evidence had been presented to link the witnesses' moving away to their fear of defendant. In *Smith*, however, the court found that this comment alone might not have been grounds for reversal but that in combination with "fundamental flaws permeating this trial," the conviction could not stand in light of the closely balanced evidence. Here, defendant presents no argument that the alleged errors' cumulative effect warrants reversal, and the remark did not follow a thwarted State attempt to elicit testimony that a witness feared for his life.

In sum, although the circuit court should have sustained defendant's objection, defendant was not prejudiced as a result because the evidence in this case was not close, despite impeachment of the State's witnesses with their prior inconsistent statements, nor was the error of such magnitude that it denied defendant a fair trial.

## II

Defendant next claims that the circuit court's summary denial of the jury's general request for a transcript indicates that it did not exercise its discretion in deciding to deny the request, and that by not exercising its discretion, the court erred, thereby prejudicing him. Defendant compares the wording of the judge's reply here with the court's response in *People v. Bryant* (1988), 176 Ill. App. 3d 809, 531 N.E.2d 849, in which the circuit court's neglecting to ascertain what specific testimony the jury desired was interpreted as a failure to exercise discretion or an indication that the court erroneously believed it had no discretion to grant the request. Even though he did not object to the circuit court's response or raise the issue in his post-trial motion, defendant continues, the record does not indicate that his counsel was present and this issue too may be addressed as plain error. Because his defense was based on the inconsistency and impeachment of the State's witnesses and the consistency of his own statements, which required accurate recollection and careful review of the challenged testimony, defendant reasons that the circuit court's refusal to exercise its discretion may have affected his right to a fair trial by interfering with the jury's ability to evaluate the evidence, warranting a new trial.

Granting or denying a jury's request to review a transcript is within the circuit court's discretion. (*People v. Govin* (1991), 213 Ill. App. 3d 928, 938, 572 N.E.2d 450, 457, *appeal denied* (1991), 141 Ill. 2d 550, 580 N.E.2d 124.) Although the *Bryant* court commented that "[f]ailure to determine the specific evidence or testimony desired by a jury making a general request [for a transcript] has recently been treated as a signal of a trial court's erroneous belief that it lacked discretion to grant the jury's request" (*Bryant*, 176 Ill. App. 3d at 813, 531 N.E.2d at 851), another court took exception to the notion that the record must affirmatively show that the court was aware of its power before a reviewing court may hold that a circuit court's decision was an exercise of discretion. *People v. Perry* (1989), 183 Ill. App. 3d 534, 549-50, 540 N.E.2d 379, 389, *appeal denied* (1989), 127 Ill. 2d 633, 545 N.E.2d 124.

■ Here, the court's reply to the jurors' note was a refusal to supply the transcript with no reason given for the refusal. We believe that *Perry* is the better rule and therefore respectfully decline to follow *Bryant*, which requires that a reviewing court divine a court's lack of awareness of its discretion from the wording of its ruling. As *Perry* explains, the burden is on defendant to establish that the judge

did not exercise discretion, not on the State to demonstrate that the judge did. As in *Perry*, absent a showing that the court was unaware of its discretion, we have no basis for ruling that this is so. Furthermore, there is nothing in the record to suggest that the judge breached his duty to determine whether a review of the testimony would have been helpful to the jury and whether harm might result from access to the requested testimony. (*People v. Bell* (1976), 44 Ill. App. 3d 185, 193, 357 N.E.2d 1256, 1263; see also *People v. Govin* (1991), 213 Ill. App. 3d 928, 938, 572 N.E.2d 450, 457, *appeal denied* (1991), 141 Ill. 2d 550, 580 N.E.2d 124.) Consequently, from the record before us, it is impossible to say that the court abused its discretion in not asking the jury specifically what portions of the transcript it desired or in refusing to permit the jury to review the transcript.

### III

As his final challenge to the fairness of his trial, defendant points to the publication of the color photographs in State's exhibit Numbers 1, 7, and 9, respectively, the close-up of the victim's face taken one day later at the morgue and two photos of the victim lying across the bed, her purse nearby, with her housecoat open, exposing her breasts, and a red blanket over her lower body. He argues that gruesome, inflammatory photographs may be shown to a jury only if probative of a material issue, and even if probative, such photos are inadmissible if the prejudicial impact outweighs their probative value. He contends that because the only issue in the case was who committed the crimes, not whether the crimes had been committed, the pictures lacked any probative value whatsoever and, in addition, the pictures were "extremely gruesome and explicit," especially exhibit Number 1, which showed the condition of the victim's bruised and swollen face one day after she died. Such pictures, he concludes, were unnecessary and served only to inflame the jury's passions, requiring a new trial.

Like a circuit court's decision to permit a jury to consult the transcript, decisions on allowing it to view photographs are left to the circuit court's discretion and are reversed only for abuse of that discretion. (*People v. Shum* (1987), 117 Ill. 2d 317, 353, 512 N.E.2d 1183, 1196-97 (photos showed force used and viability of fetus), *cert. denied* (1988), 484 U.S. 1079, 98 L. Ed. 2d 1022, 108 S. Ct. 1060.) Even gruesome and inflammatory photographs may be admitted if sufficiently probative, *e.g.*, probative of the amount of force used. (*People v. Driskel* (1991), 224 Ill. App. 3d 304, 314-15, 586 N.E.2d 580, 587 (over 50 photos were allowed because probative of amount of force

and number of persons who committed offense and, in any event, any error was harmless).) Moreover, even if cumulative of testimony,

> "demonstrative evidence may be clearer and more persuasive than oral testimony covering exactly the same points and [the supreme court] has allowed the jury to view photographs of a crime victim even when the photographs simply depict what witnesses have orally described. [Citation.] [The supreme court] ha[s] also held that photographs of a decedent which are relevant to establish any issue of fact are admissible in spite of the fact that they may be gruesome or inflammatory [citations], and that it is not an abuse of discretion to allow the jury to consider photographs which may be characterized as 'disgusting' [citations]. [The] court has also held that '[t]he major bulwark against prejudicing the jury is the sound discretion of the trial judge.' [Citation.]" *People v. Simms* (1991), 143 Ill. 2d 154, 176-77, 572 N.E.2d 947, 956, *cert. denied* (1992), 502 U.S. 1031, 116 L. Ed. 2d 776, 112 S. Ct. 870 (admission of photos of victim's partially naked body, of stab wounds in neck, and of bloodstains in victim's apartment was not abuse of discretion at first stage of sentencing hearing because probative of the defendant's mental state even though he had confessed that he had stabbed the victim repeatedly, knowing it would kill her).

See also *People v. Cardona* (1992), 240 Ill. App. 3d 110, 118; *People v. Jones* (1992), 236 Ill. App. 3d 244, 249.

▪ Here, although the photos graphically demonstrate the injuries to the victim, their value as demonstrative evidence cannot be gainsaid. Because the charges against defendant included crimes for which force was an essential element, pictorial depictions of the result of force were highly probative of guilt of the charged offenses. Too, only three photographs were admitted, and we do not find these pictures prejudicially gruesome given the nature of the crimes. Thus, the circuit court did not abuse its discretion in admitting them.

For these reasons, we affirm the circuit court's judgment.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.