2022 IL App (2d) 210061-U
No. 2-21-0061
Order filed November 30, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-1129 |
| TERRELL DEMONTE ELLIS, | ) ) ) | Honorable Randy Wilt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The State's evidence showed that the victim's murder involved exceptionally brutal or heinous behavior indicative of wanton cruelty where the victim was horrifically beaten, had no defensive wounds, and was left to die in a degrading position.

¶ 2    Following a jury trial, defendant, Terrell Demonte Ellis, was found guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2016)). The jury also found that the murder involved exceptionally brutal or heinous behavior indicative of wanton cruelty (730 ILCS 5/5-8-1(a)(1)(b) (West 2016)). Based on that finding, the trial court sentenced defendant to an extended term of 70 years' imprisonment—10 years above the maximum nonextended term of 60 years. See id. § 5-

4.5-20(a). On appeal, defendant argues that the State failed to prove beyond a reasonable doubt that the murder involved exceptionally brutal or heinous behavior indicative of wanton cruelty. We disagree and affirm.

¶ 3                                I. BACKGROUND

¶ 4      At trial, the parties stipulated that defendant had no "physical contact" with the victim—his girlfriend, Monica Box—from January 15, 2016, to April 27, 2016. During that time, defendant wrote letters to Box professing his love for her but threatening to harm her if she cheated on him. Within 24 hours after defendant reunited with Box on April 27, 2016, he murdered her.

¶ 5      On April 28, 2016, the day of Box's murder, her 13-year-old daughter, Markayla, came home from school at about 5:15 p.m. with her girlfriend. They encountered defendant, whom Markayla knew, walking naked down the stairs from the second floor. When defendant saw the girls, he said " '[o]h, shit,' " and the girls left, laughing. When they returned minutes later, they went to Markayla's first-floor bedroom to talk. They heard defendant walking around Box's room, which was directly above Markayla's. When they no longer heard footsteps, they exited Markayla's room. The girls noticed a strange odor, including a burnt smell. The girls looked for Box and noticed her car was gone, which had been there when they got home. Eventually, they found Box in her bedroom, kneeling on the floor, and facing the wall. She was naked from the waist down, bleeding from the head, and unconscious.

¶ 6      Paramedics at the scene found that Box had no pulse and only very shallow agonal respirations, which are not real respirations but the brain's last gasping attempts to get oxygen. They administered CPR and attempted to revive Box, but they were unsuccessful.

¶ 7      An autopsy revealed that blunt-force trauma to the head ultimately caused Box's death. An internal examination showed extensive and deep hemorrhaging to the front and sides of Box's

brain, which suggested that Box received blunt impacts that caused bleeding in different regions and layers of her brain. Box also sustained numerous lacerations, abrasions, bruising, and swelling to her face and head. She had no defensive wounds. The crime lab could not exclude defendant as the source of semen recovered from Box's vagina. Box was not pregnant.

¶ 8    Police discovered evidence at the scene, including (1) numerous bloodstains in Box's bedroom and around the house; (2) bloodied pieces of white plastic in Box's hair and in trash cans around the house—the plastic pieces were from a broken blood-stained laundry basket found in a storage room; (3) a bloodstained claw hammer in a kitchen drawer; (4) cleaning supplies, including a bucket containing bleach and blood-soaked paper towels; (5) a backyard grill containing burned documents; (6) a toilet containing torn documents; and (6) an open pregnancy test on Box's bedroom dresser. Box's car was left unattended on the street approximately 1 to 1½ miles from the scene with the keys in the center console.

¶ 9    During closing argument, the State claimed that Box died after defendant beat her repeatedly with a laundry basket and a hammer. Defendant argued that the State failed to prove that he used the hammer or that Box had been struck repeatedly.

¶ 10    After defendant was convicted and sentenced, he moved the trial court to reconsider his sentence. He argued, among other things, that the evidence did not warrant an instruction on whether the murder included exceptionally brutal or heinous behavior indicative of wanton cruelty. The trial court denied the motion, and this timely appeal followed.

¶ 11                                II. ANALYSIS

¶ 12    Defendant argues that the State failed to establish beyond a reasonable doubt that Box's murder included exceptionally brutal or heinous behavior indicative of wanton cruelty. When a reviewing court addresses a challenge to the sufficiency of the evidence, " 'the relevant question

is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill.2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This same standard of review applies regardless of whether the evidence is direct or circumstantial." *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

¶ 13    Courts treat brutal or heinous behavior indicative of wanton cruelty as an element of the offense of first-degree murder, which the State must establish beyond a reasonable doubt. See *People v. Callahan*, 334 Ill. App. 3d 636, 649 (2002). Our supreme court has held that "[t]he terms 'brutal,' 'heinous,' and 'indicative of wanton cruelty' are given their ordinary and popular meaning." *People v. Nitz*, 219 Ill. 2d 400, 418 (2006) (quoting *People v. La Pointe*, 88 Ill. 2d 482, 499 (1981)). Elaborating on the meaning of these terms, the *Nitz* court stated as follows:

> "For behavior to be heinous, it must be 'hatefully or shockingly evil; grossly bad; enormously and flagrantly criminal.' [Citations.] We define brutal behavior as 'behavior that is grossly ruthless, devoid of mercy or compassion; cruel and cold-blooded.' [Citations.] Brutal or heinous behavior generally involves prolonged pain, torture, or premeditation [citation], but does not necessarily require them [citation]. Behavior must qualify as either brutal or heinous for the sentencing enhancement to apply. [Citation.]

In addition to being exceptionally brutal or heinous, the crime must also be indicative of wanton cruelty. ' "[W]anton cruelty" requires "proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense." ' [Citation.]" *Id.*

¶ 14    Determining whether a defendant's behavior was brutal or heinous and indicative of wanton cruelty requires an evaluation of all the unique facts and circumstances surrounding the incident. See *People v. Jones*, 236 Ill. App. 3d 244, 251 (1992). Although "[a]ll murders are brutal

and heinous to a certain degree," enhanced sentences are reserved for murders that are exceptionally brutal or heinous. *People v. Andrews*, 132 Ill. 2d 451, 466 (1989). Thus, enhanced sentences "[are] meant for murders that go beyond the mere infliction of death." *People v. Anderson*, 201 Ill. App. 3d 75, 81 (1990).

¶ 15    Box's murder met this threshold. That is, viewing the evidence in a light most favorable to the State, as we must (*Collins*, 106 Ill.2d 237 at 261), we conclude that Box's murder included exceptionally brutal or heinous behavior indicative of wanton cruelty. Specifically, the evidence revealed that defendant had sex with Box, a woman he claimed to love. Afterwards, however, suspicious that she was cheating on him, defendant forced her to sit facing the wall while he punished her, repeatedly striking her on her head until she was near death. Although Box was still alive when Markayla and her friend came home, defendant did not alert Markayla to what had happened or do anything to help Box. Instead, after knowing Markayla and her friend had seen him, defendant attempted to cover up his crime by cleaning up bloodstains and destroying evidence. Defendant then fled while Markayla was left to discover Box. Box bore no defensive wounds. She was in a degrading position, half naked and facing the wall. At that point, Box was still alive, but only in the most rudimentary way.

¶ 16    Defendant argues that the State failed to meet its burden, because, according to defendant: "murders involving blunt force trauma are fairly common, the autopsy evidence was inconsistent with the State's theory that the hammer found at the scene was used to strike the fatal blows to *** Box's head, and *** in the absence of any occurrence witnesses, the State's insistence on a prolonged and torturous beating was entirely speculative." We disagree.

¶ 17    Defendant's reliance on the absence of a witness is a nonstarter, as sufficient other evidence established defendant's guilt. That evidence revealed that Box died from extensive hemorrhaging to multiple regions and layers of her brain caused by blunt force impacts to the head. The conclusion we draw from this evidence is that defendant struck Box's head several times with something that ultimately caused her death. The State reasonably based its theory on the bloody claw hammer in the kitchen drawer. Moreover, defendant's denial that he used a hammer to beat Box only strengthens the State's position that the beating was protracted and vengeful. The only other object connected to the murder was the plastic laundry basket and using a plastic laundry basket to kill Box would require more numerous and forceful blows than a hammer. Evidently, the blows with the laundry basket were *very* forceful, as many pieces were found in Box's hair and her trash cans. Regardless, the natural inference from all this evidence was that the beating was severe, prolonged, and torturous. Thus, the jury's brutal-and-heinous finding was amply supported by the evidence.

¶ 18                                III. CONCLUSION

¶ 19    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 20    Affirmed.