NOTICE
Decision filed 12/11/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220526-U

NO. 5-22-0526

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 20-CF-250 |
| | ) | |
| ANTOINE D. CRAIG, | ) | Honorable |
| | ) | Benjamin W. Dyer, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Vaughan and Justice Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction and sentence for first degree murder where the trial court did not abuse its discretion by denying defendant's motion to bifurcate the guilt and sentencing phases of defendant's trial, the court's admission of cell phone and location data records and related testimony was harmless error, and defendant's natural life sentence was not excessive.

¶ 2    Following a jury trial in the circuit court of Champaign County, defendant, Antoine D. Craig, was convicted of first degree murder and sentenced to natural life in prison. Defendant appeals, arguing that (1) the trial court erred by denying his motion to bifurcate the guilt and sentencing phases of his trial, (2) the court erred by admitting cell phone and location data records as self-authenticating business records and by allowing testimony regarding the records, and (3) his natural life sentence is excessive. For the following reasons, we affirm.

1

¶ 3                                    I. Background

¶ 4      On February 27, 2020, the State charged defendant by information with four counts of first

degree murder—intentional (720 ILCS 5/9-1(a)(1) (West 2018)) (count I), strong probability (*id*.

§ 9-1(a)(2)) (count II), knowing (*id*. § 9-1(a)(1)) (count III), and felony (*id*. § 9-1(a)(3)) (count

IV)—in connection with the February 23, 2020, death of Tenesha Jenkins. Law enforcement

discovered Jenkins with superficial lacerations and burns to her body, but the pathologist later

determined that her cause of death was smothering by another person. The State filed a notice of

intent to seek a natural life sentence on the basis that the murder was accompanied by exceptionally

brutal and heinous behavior indicative of wanton cruelty as an aggravating factor and as a factor

to be proven beyond a reasonable doubt (730 ILCS 5/5-8-1(a)(1)(b) (West 2018)). The trial court

appointed counsel to represent defendant at defendant's request, but defendant later hired private

counsel. Defendant requested a jury trial and obtained new counsel once more.

¶ 5      On April 18, 2022, following discovery and various continuances, defense counsel and the

State filed various pretrial motions. Defense counsel filed a motion to bifurcate the trial pursuant

to Illinois Supreme Court Rule 451(g) (eff. Apr. 8, 2013). Defense counsel requested a proceeding

on the issue of guilt or innocence, and if the State proved defendant guilty by proof beyond a

reasonable doubt, a second proceeding on the issue of whether evidence existed that the murder

was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

Counsel alleged that defendant "may choose to waive jury for the second proceeding." According

to counsel, the evidence regarding the sentencing enhancement was irrelevant to the question of

guilt and the undue prejudice from such evidence outweighed its probative value. Counsel sought

to bar testimony and photographs or videos relating to any superficial burns and lacerations or

abrasions on Jenkins' body. Thus, counsel requested that the trial court bifurcate the trial "to

prevent the jury from being unduly prejudiced by certain evidence regarding the crime scene when determining guilt."

¶ 6    Defense counsel also filed a motion to bar unduly prejudicial evidence. Defense counsel requested that the trial court prohibit the introduction of prejudicial photographs, videos, and testimony. Counsel alleged that Jenkins' cause of death was smothering by another person and, thus, any evidence regarding Jenkins' burns or lacerations would only inflame and upset the jury and prejudice them against defendant. Thus, counsel requested that the court prohibit the introduction of photographs of, or testimony regarding, superficial wounds or burns on Jenkins, as well as videos, photographs, or testimony regarding any injuries that were not directly related to smothering by another person as the cause of death.

¶ 7    The State filed a motion *in limine*, requesting that the trial court allow the State to present evidence of self-authenticating business records, pursuant to Illinois Rule of Evidence 902(11) (eff. Sept. 28, 2018). The State alleged that law enforcement subpoenaed business records from T-Mobile and Google which were relevant to the case. The State alleged that the records "would be self-authenticating if they [were] accompanied by a proper certification by a custodian."

¶ 8    Also, on April 18, 2022, the trial court addressed the pretrial motions at a hearing. With regard to the self-authenticating business records, the State argued that it included copies of certificates prepared by custodians from Google and T-Mobile. According to the State, the certificates met the requirements of the evidence rules so as to lay the foundation for the admissibility of the records. Defense counsel objected to the State's request to admit the business records but presented no argument on the issue. The court noted its belief that "under Rule 902(11), admission by way of certified record of a self-authenticating document is permissible." Thus, the

3

court granted the State's motion *in limine*, which sought to admit the T-Mobile and Google account records.

¶ 9    With regard to defense counsel's motion to bifurcate, defense counsel argued that it would be impossible to argue to a jury that defendant did not commit the murder, but if he did, it was not brutal or heinous. Counsel noted that she filed the other motion to bar unduly prejudicial evidence "in tandem with [the motion to bifurcate], because that's precisely the reason for us to want to bifurcate this trial." According to counsel, bifurcation was necessary to bar prejudicial evidence at the guilt phase that would go towards proving the murder was brutal or heinous. Counsel asserted that defendant would waive a jury for the element of whether the murder was brutal or heinous. The State responded that there was a presumption for a unitary trial, that the brutality of the crime would demonstrate intent to kill, and that all the evidence would be admissible at both phases of the trial. The trial court noted that it "considered the rule and the comments, and read a few cases on this issue." The court agreed with the State, noting that the State planned to present evidence to show different theories of murder and that the kind of evidence the State intended to introduce weighed in favor of a unitary trial where the relationship between defendant and the victim was one of the issues in the trial. The court noted that "bifurcating the trial would put the State in a difficult position relative to some of its evidence which may show, for example, motive to commit the act in the first place, or the likelihood that the defendant committed the act." Thus, the court denied defendant's motion to bifurcate.

¶ 10    The trial court also denied defendant's motion to bar prejudicial evidence, in part, noting that it considered the photographic evidence that the State intended to present and found the photographs, "while gruesome," helped explained to the jury what happened. The court granted defendant's motion with respect to duplicative photographs and several photos of the back of

4

Jenkins' head which depicted blunt force trauma. The court reserved ruling on photographs of Jenkins' eyes, which depicted hemorrhaging from suffocation.

¶ 11 On April 19, 2022, defendant's three-day jury trial commenced. At the outset, the trial court confirmed that defendant understood the State filed notice of intent to seek natural life sentencing. The State indicated that it previously offered defendant 30 years, but defendant rejected the offer and no offer remained pending.

¶ 12 During opening statements, the State stated that it would present evidence showing that defendant and Jenkins dated in February 2020. Defendant, Jenkins, and Jenkins' friend, Neoshi Gipson, went to a bar on February 22, 2020. Defendant left the bar after he and Jenkins got into an argument. Jenkins and Gipson left the bar shortly thereafter and the argument between Jenkins and defendant continued in the bar parking lot. Gipson drove Jenkins home in Jenkins' car and then drove Jenkins' car to her own home, promising to return the car to Jenkins later that morning. When Gipson was unable to contact Jenkins later that morning, she drove to Jenkins' home. Once there, Gipson spoke with defendant, who advised her that Jenkins was sleeping. Gipson called police, and defendant fled when police arrived at Jenkins' home.

¶ 13 The State informed the jury of the following details regarding Jenkins' death:

> "The evidence is going to show that [Jenkins] was beaten with a blunt object. That her face was cut repeatedly on both sides with a sharp object, maybe a glass bottle. She was then transferred to her bed. This happened in the doorway of her bedroom. You're going to hear from a bloodstain expert that said that when she was struck, she had to be either kneeling or on the ground. But then she was transferred to her bed, where the evidence will show that the side of her head was lit on fire, and you're going to see evidence that this happened while she was still alive.
>
> And finally, you're going to see that she was smothered, either with a pillow or a comforter that was nearby, or maybe with the defendant's hand. But you're going to see evidence, or hear evidence from the pathologist that she was smothered and died, and was murdered."

¶ 14 The State also advised the jury that they would hear that law enforcement "researched the defendant's phone" and tracked defendant's movements from Google applications on his phone. Specifically, law enforcement tracked defendant "from going to Neil Street bar, back to [Jenkins'], to fleeing right at the time when that deputy knocked on the door, to going to that liquor store, and then finally fleeing away."

¶ 15 After opening statements, the State presented witness testimony and exhibits. The evidence generally established that Jenkins resided at 2208 Dale Drive, Champaign, Illinois, in February 2020, and that Jenkins was found dead in her home on February 23, 2020.

¶ 16 Gipson testified regarding her interaction with Jenkins and defendant from the late evening hours of February 22, 2020, to the morning of February 23, 2020. Gipson and Jenkins were friends. Jenkins, defendant, and Gipson went to a bar called Neil Street Blues shortly before midnight on February 22, 2020. The three rode together in Jenkins' car. Jenkins and defendant were dating at that time. Jenkins and Gipson left the bar together at closing time. After Jenkins and Gipson left the bar, Gipson observed Jenkins and defendant arguing in the parking lot across from the bar. During the argument, defendant grabbed Jenkins' wig off of her head and threw it into the parking lot. Gipson retrieved Jenkins' wig and gave it to Jenkins, but defendant again grabbed the wig and threw it into the parking lot. Gipson recalled that defendant "called [Jenkins] some names. He called us some B's, bitches." Jenkins was embarrassed and upset by defendant's actions. Gipson drove Jenkins home in Jenkins' car, went inside Jenkins' home to use the restroom, and then drove herself home in Jenkins' car. Gipson planned to return Jenkins' car later that morning.

¶ 17 Gipson testified regarding surveillance footage from the bar, which was played for the jury without objection from the defense. Gipson confirmed that the footage depicted Gipson, Jenkins, and defendant enter the bar shortly after midnight. Gipson confirmed that defendant appeared to

approach Jenkins and say something to her shortly before the bar closed at 2 a.m. Gipson did not recall what defendant said to Jenkins. Gipson noted that the footage depicted defendant leaving the bar before Gipson and Jenkins left at approximately 1:59 a.m. Gipson also identified footage showing the argument between defendant and Jenkins in the bar parking lot at approximately 2:15 a.m. on February 23, 2020.

¶ 18    Gipson testified that she attempted to call and text Jenkins later that morning but received no response. Gipson then drove to Jenkins' home and went inside. Once inside, Gipson "saw some broken items, and the defendant." Gipson explained that defendant was standing in "the kitchen area, hallway" of Jenkins' home. When asked to describe what defendant was wearing, Gipson responded, "He had on a blue sweater with like some writing on it, and some jeans." Defendant told Gipson that Jenkins was asleep and motioned for Gipson to give him Jenkins' car keys. Gipson left because she felt "unsafe" and "like something was wrong." Gipson called law enforcement. When Gipson was first interviewed by law enforcement at the crime scene, she did not mention that she saw defendant at Jenkins' home because she was scared. Gipson gave a more detailed interview to law enforcement the following day, which included her interaction with defendant at Jenkins' home on February 23, 2020.

¶ 19    On cross-examination, Gipson clarified that she went to Jenkins' home with a friend later in the morning, but that Gipson went to Jenkins' door alone. Gipson told her friend in the car that she saw defendant, but she did not tell police "at that moment." Gipson also clarified that she called someone else before she called law enforcement. On redirect, Gipson explained that she called Jenkins' cousin before she called law enforcement.

¶ 20    Champaign County Deputy Sheriff Richard Ferriman and Champaign County Sheriff's Sergeant Jeff Vercler testified regarding their investigation of Jenkins' death. Both officers arrived

7

at Jenkins' home to conduct a welfare check shortly before noon on February 23, 2020. Officer Ferriman, who was the first to arrive at the scene, observed a jacket in the tree in the front yard and open windows. Officer Ferriman knocked on the door and heard movement inside. Officer Ferriman observed, through a partially frosted glass door window, an individual standing at the door. Officer Ferriman testified that he observed "a black male that had a navy blue zip-up jacket" with "the letters on the arm of the jacket, N A U, that [Officer Ferriman] thought to be a Nautica brand jacket." Officer Ferriman also observed broken glass in the home. Officer Ferriman heard a screen door slam from behind the house, so he began "looking around to see if [he] could see anybody." Officer Ferriman believed "the suspect ran out the screen door and jumped the fence behind the house." When Officer Ferriman entered the home, he observed all four burners to the stove turned on "as high as they could go." He turned the burners off. On cross-examination, Officer Ferriman testified that law enforcement was unable to locate the individual he observed inside the home.

¶ 21    Both officers observed that the door to Jenkins' home had been pushed or kicked in. Both officers also observed broken items in multiple areas of the home and Jenkins' body lying nude on a bed in a bedroom. No one else was in the home. The officers observed broken glass and bloody shoeprints in the room where Jenkins' body was found. Both officers wore body cameras and recorded their investigation of Jenkins' home. The body camera footage was played for the jury without objection from defense counsel.

¶ 22    Retired Champaign County Sheriff's Sergeant Nicole Bolt testified regarding her investigation of Jenkins' home. Bolt collected evidence and took photographs at Jenkins' home on February 23, 2020. Bolt identified multiple photographs taken of Jenkins' home. Photographs of the front of Jenkins' home depicted various items of clothing strewn about Jenkins' front yard.

8

Photographs also depicted a blue lighter that was found under a coat in the front yard and the damage to Jenkins' front door. Photographs from inside Jenkins' home revealed multiple broken items, broken glass, washcloths with red stains, Lysol wipes, and an open bottle of bleach. A photograph from the hallway of Jenkins' home revealed areas with "a lot of glass, and then where it looked like they had been swept down the hallway." Another photograph from the hallway depicted footwear impressions in red stains. Photographs from the room where Jenkins' body was found depicted Jenkins' cell phone, cigarette butts, broken glass, a broken doorknob, and multiple items strewn about the floor. Bolt observed "a large concentration of blood right there in the middle, right inside the door, and then that's where her phone was, and I mean, just a lot of glass everywhere." Bolt also observed fecal matter in the large bloodstain. Bolt additionally observed a comforter with bloodstains and a "white soot-looking substance" on it, a pillow with bloodstains, and the top of a broken champagne bottle. Bolt further identified multiple photographs depicting bloodstains and spatter on the walls.

¶ 23    Bolt next testified regarding the photographs she took of Jenkins' body. Bolt identified a photograph depicting Jenkins on the bed with "a lot of lacerations on her face." The photograph also depicted "a small area of pooled blood there on the mattress, and then there was a burned area on the mattress as well." The photographs demonstrated that Jenkins suffered "a lot of injuries to the side" of her face and that "she'd been burned on the side of her head." Jenkins also had blood and bruising on her hands.

¶ 24    Champaign County Sheriff's Detective Brad Wakefield testified regarding his investigation into Jenkins' death. Detective Wakefield spoke with witnesses and attempted to locate surveillance footage in the area surrounding Jenkins' neighborhood. During his investigation, Detective Wakefield obtained surveillance footage from a property manager down

the street from Jenkins' home. Detective Wakefield also obtained surveillance footage from various businesses, including Blackhawk Liquors at 2401 West Springfield, Chelsea's Video Poker also at 2401 West Springfield, Neil Street Blues at 301 North Neil Street, Allure Salon and Spa at 340 North Neil, and Star Fox Liquors at 1005 West Bloomington Road. The surveillance footage was played for the jury without objection from defense counsel.

¶ 25    Detective Wakefield testified regarding the footage obtained from the property manager down the street from Jenkins' home. Detective Wakefield explained that footage came from an exterior video surveillance camera located on top of the roof line of an apartment building, referred to as the "east building." Detective Wakefield further explained that when viewing the footage, Jenkins' home would be located in the northwest direction. The time stamp on the footage was 11:50 a.m. to 11:52:13 a.m. on February 23, 2020. Detective Wakefield testified that the footage depicted a man, who was wearing clothing similar to the clothing worn by the individual Officer Ferriman observed at Jenkins' home, traveling away from Jenkins' home.

¶ 26    Detective Wakefield also testified regarding footage with a time stamps from 11:55:24 a.m. to 11:56:21 a.m. According to Detective Wakefield, the footage depicted the man "wearing the blue top emerge from the side of—beside the west apartment complex in between the fence area." Detective Wakefield explained that a vehicle arrived a short time later. Detective Wakefield later identified the registered owner of the vehicle as Ethel Sabrina Jones, who provided investigators with additional details regarding defendant's whereabouts which led investigators to additional surveillance footage at Star Fox Liquors.

¶ 27    Detective Wakefield testified that law enforcement ultimately located defendant in Rantoul, Illinois, on February 25, 2020. Defendant was not wearing the blue sweatshirt or other clothing observed by Officer Ferriman or depicted in the surveillance footage when he was found

10

by law enforcement. Detective Wakefield testified that such clothing was never recovered during the investigation.

¶ 28 Detective Wakefield testified that he learned the PIN for Jenkins' cell phone from one of Jenkins' friends. The PIN successfully opened Jenkins' phone, which law enforcement recovered from Jenkins' home. Wakefield identified a photograph of Jenkins' phone, as well as photographs taken of Jenkins' cell phone screen. The photographs of Jenkins' cell phone screen were admitted into evidence by stipulation of the parties. The parties stipulated that Jenkins' cell phone was recovered from her home on February 23, 2020, and preserved in accordance with proper evidentiary standards. The parties further stipulated that law enforcement unlocked the phone at approximately 1:30 p.m. on March 10, 2020, and photographed the display screens. The parties further stipulated that the photos fairly and accurately depicted what the phone displayed.

¶ 29 The photographs demonstrated that Jenkins had a contact listed in her phone as "Antoine," defendant's name, with a phone number of 1-217-766-*** (People's Exhibit C8). The photographs also demonstrated that Jenkins had three missed calls from "Antoine" at 3:11 a.m., 3:14 a.m., and 3:25 a.m. on February 23, 2020 (People's Exhibit C9 and People's Exhibit C10). The photographs further demonstrated that Jenkins called "Antoine" for eight seconds at 2:58 a.m., four seconds at 2:59 a.m., and one minute at 3:06 a.m. on February 23, 2020 (People's Exhibit C11). The photographs additionally indicated that "Antoine" sent the following text messages to Jenkins at approximately 3:15 a.m.: "Bye bitch," "Dick sucjer," "Fake hoe who do dicks lol," "U just something to do with yo mouth," and "I just want my money u dead hoe" (People's Exhibit C5).

¶ 30 Sabrina Jones testified regarding her involvement with defendant on February 23, 2020. At approximately 12 p.m. on that date, Jones was driving her friend Derrick Williams home when he received a phone call from "his cousin" who needed a ride. Jones agreed to pick up Williams'

11

cousin in "Dobbins Downs." Jones identified her vehicle as the vehicle portrayed in the surveillance footage obtained from the property manager in Jenkins' neighborhood, which depicted the individual in the blue sweatshirt getting into a vehicle near the apartment complex at approximately 11:55 a.m. Jones testified that the individual in the footage was defendant. Jones explained that defendant was wearing "a blue sweater, some light-colored jeans," and "some white Air Force Ones." Jones further testified that, once in her vehicle, defendant stated "that he had got into it with her." Jones testified that Williams questioned defendant about red stains on his clothing. According to Jones, defendant "said that she had came [*sic*] at him. He said, I cracked her. He said she fell back on a stand or something. He said blood was everywhere, and that was it." Jones also recalled hearing defendant say that the woman he referenced "was at the house asleep." Before dropping the men off at Williams' home, Jones agreed to take them to Star Fox Liquor Store located on Bloomington Road.

¶ 31 The State played the surveillance footage from Star Fox Liquors for the jury without objection from the defense. The State asserted that the footage ended "at the 12:07:37 mark" according to the time stamp on the video. Jones testified that she agreed the footage depicted defendant wearing a blue sweatshirt. When defendant walked into the liquor store, Jones observed what she believed to be "dried up mud" on defendant's shoes. Jones clarified that defendant's shoes appeared dirty. Jones then drove the two men to Williams' mother's house on Joanne Lane. Law enforcement interviewed Jones about her vehicle on February 24, 2020, and Jones allowed them to search her car for evidence at that time.

¶ 32 Dr. Shiping Bao, a forensic pathologist, testified regarding the autopsy he performed on Jenkins on February 25, 2020. Dr. Bao determined that Jenkins' cause of death was "[s]mothering by another person," due to the presence of an intraoral aberration and hemorrhage in both eyes.

Dr. Bao observed superficial burns on Jenkins' face, forehead, and hair, which he believed occurred while Jenkins was alive due to redness. He also observed "numerous sharp force trauma, which [were] consistent with the broken glass [bottle] on the face, head, neck, chest, abdomen, everywhere." Jenkins had contusions to both forearms and the back of her hands, which were consistent with defensive injuries. Jenkins also suffered blunt force trauma to the bilateral temple and the back of her head, consistent with the punch which caused the hemorrhage under the skin, as well as a subdural hemorrhage between the dura and brain inside the skull. Dr. Bao observed a bloody footprint on Jenkins' back, which indicated someone stepped on her. In addition, Dr. Bao observed red scratches on Jenkins' back, which indicated that she was dragged while she was still alive. Dr. Bao identified various photographs taken during Jenkins' autopsy, which were admitted into evidence. The trial court allowed Dr. Bao to testify regarding the hemorrhaging in both Jenkins' eyes but did not allow the State to admit photographs depicting Jenkins' eyes. On cross-examination, Dr. Bao testified that he determined Jenkins' cause of death was smothering, but he did not know if the smothering was done by hand, pillow, blanket, or a specific object.

¶ 33     Brian Long, a forensic scientist employed by the Illinois State Police, testified regarding his analysis of fingerprints found at the crime scene. Long concluded that a fingerprint found on a bloody notebook in Jenkins' bedroom matched defendant's fingerprint.

¶ 34     Dr. Sangeetha Srinivasan, a forensic scientist employed by the Illinois State Police, testified regarding DNA testing he performed on items recovered from Jenkins' home and Jones' car. Dr. Srinivasan could not exclude defendant as a contributor of a major DNA profile found on several items in Jenkins' home, including a cigarette butt, Jenkins' hip, Jenkins' ankle, a broom handle, and the notebook. Dr. Srinivasan testified that Jenkins could not be excluded as a

contributor of a major DNA profile found on a swab taken from the passenger door handle of Jones' vehicle.

¶ 35    Illinois State Police Sergeant Dewayne Morris testified regarding his analysis of the bloodstain patterns at Jenkins' home. Morris entered measurements taken at the crime scene into a computer program called HemoSpat Software, which generated a report indicating that the origin of the blood spatter was a volleyball-sized area near the doorway of Jenkins' bedroom. Morris testified that the bloodstains were indicative of multiple hits, but he was unable to offer an opinion as to the object that created the blood spatter or who used it.

¶ 36    Former Champaign County Sheriff's Deputy Tim Beckett testified regarding his investigation into Jenkins' cell phone, as well as defendant's Google and T-Mobile records. As lead detective, he analyzed Jenkins' texts and contacts after investigators located her phone at the crime scene. Defendant's contact information was recovered from Jenkins' phone, and defendant's phone carrier was determined to be T-Mobile. Law enforcement obtained a search warrant for defendant's phone records, and T-Mobile sent back records associated with defendant's phone number. Through Officer Beckett's testimony, the State presented testimony, records, and certificates relating to defendant's Google and T-Mobile accounts over defendant's objection.

¶ 37    The State presented a certificate of authenticity from Google, which was signed by Google records custodian Jeffrie Gonzalez and provided, in pertinent part, as follows: "Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge" (People's Exhibit D2). The State also presented a Google Data Summary, which provided the following details regarding defendant's whereabouts on February 23, 2020: 1213-1123 Northwood, Champaign from 2:30 a.m. to 3:31 a.m.; 2207-2208 Dale Dr., Champaign from 3:59 a.m. to 5 a.m.; 1213-1123 Northwood, Champaign from 5:15 a.m. to 5:27 a.m.; 2205-2208

14

Dale Dr., Champaign from 5:45 a.m. to 11:52 a.m.; 1001 to 1005 W. Bloomington, Champaign at 12:06 p.m.; 1205 Joanne Ln., Champaign from 12:20 p.m. to 1:14 p.m.; and 2000 N. Mattis Ave., Champaign from 2:56 p.m. to 5:56 p.m. (People's Exhibit D3).

¶ 38    Officer Beckett testified that he entered the location data into Google Maps and compiled a summary of defendant's locations. The summary was admitted into evidence without objection from the defense. The summary showed that defendant was at Blackhawk Liquors at 11:45 p.m. on February 22, 2020. The summary additionally showed that defendant was at Neil Street Blues from 12:27 a.m. to 1:49 a.m. Defendant went within a "small radius" of Jenkins' home, and then back to Neil Street Blues at 2:15 a.m. He then went to his daughter's home after that, and then back to Jenkins' home from 3:59 a.m. to 5 a.m. Defendant went back to his daughter's home and again to Jenkins' home at around 5:45 a.m. until 11:52 a.m. The summary additionally showed that defendant went to Star Fox Liquors at 12:06 p.m. before he went to Williams' mother's home from 12:20 p.m. to 1:15 p.m.

¶ 39    The State also presented testimony and records relating to defendant's T-Mobile account over defendant's objection. The State presented a certificate from T-Mobile, which was signed by T-Mobile records custodian Diana Gonzalez and provided, in pertinent part, as follows: "I, Diana Gonzalez, attest, under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. Section 1746, that the information contained in this declaration is true and correct" (People's Exhibit D4). The records demonstrated that the subscriber associated with the phone number was "Antoine Craig."

¶ 40    Officer Beckett further testified that Jenkins' phone log indicated that Jenkins sent a photo of defendant to the contact listed as "Antoine" at 10:35 p.m. on February 22, 2020. Officer Beckett also testified regarding the series of text messages "Antoine" sent Jenkins from 3:11 a.m. to 3:25

15

a.m., as outlined in People's Exhibit C5. Officer Beckett testified that Jenkins missed a FaceTime video call from an email address firstofallyou'reugly@icloud.com, and that Jenkins made a series of outgoing calls to an unknown number from 2:26 a.m. to 2:35 a.m. Jenkins called the contact "Antoine" five times at 2:33 a.m. and seven more times at 2:50 a.m. Jenkins called a contact listed in her phone as "Bunk" at 2:50 a.m. and called "Antoine" again at 3:06 a.m. Beckett testified that the contact "Antoine" last called Jenkins at 3:25 a.m. on February 23, 2020.

¶ 41     In closing arguments, the State advised the jury that what defendant did to Jenkins was "unimaginable" and that it was "necessary that we say it out loud, what he did to her." The State recounted:

> "He smashed her into that glass case, broke all the glass shelves into small pieces. [Jenkins] fell into the broken glass, and then he cracked her. That's his words. He cracked her with that champagne bottle, over and over, to the point where blood stained the walls. Over and over, until it broke on her head while she is either kneeling or laying on the ground right in that doorway. And he didn't stop. After he broke, instead of pounding her, he started slashing her, both sides of her face, over and over, until her face was shredded, until [Jenkins] defecated on herself. But even that wasn't enough to stop him. He dragged her through the broken glass, put her on the bed, and lit her on fire. And not just the flash of a flame, fire enough to burn black, deep into that mattress, enough to burn both sides of her head, the skin and the hair completely gone. Her shoulders, her back. And then he smothered her, hard enough that he bruised the inside of her gums, and hard enough that her eyeballs, the veins in her eyeballs exploded red. And that's how he killed her, probably to stop her from screaming."

The State further argued that after Jenkins and defendant had an argument at the bar, defendant did not go home. According to the State, "because of the GPS we know he briefly goes to [Jenkins'] house, then comes back and waits for her at the bar. And he becomes enraged, and he texts her in these messages. These vile, degrading messages, that is his mindset." The State noted that after Jenkins left the bar with Gipson, defendant sent "these messages," including a message that stated, "I just want my money, you dead ho." The State added that the GPS showed that after he sent the messages, he went to Jenkins' house, kicked in the door, and threw money at her. The State noted

16

that defendant attacked Jenkins throughout the house, and even outside the house, as evidenced by the broken items throughout the home and items found in the front lawn. The State asserted that "we know after he killed her[,] he briefly went back to the place where he was staying, and then returned to the house. No doubt he went to go get some bleach, and start trying to clean up the murder he had just committed." According to the State, Gipson came to the door while defendant was "in the middle of cleaning up." Defendant turned the burners on high before jumping the fence to elude police. The State explained that defendant "got this ride just a few minutes later."

¶ 42    The State advised the jury that "we have his GPS, and we have eye witnesses, and we have every inch of where he went." The State noted the surveillance footage depicted the argument between Jenkins and defendant in the parking lot outside the bar. The State played the body camera footage and stated, "And we know he was there at her house where he killed her. That's the still from the body cam, where he came to her door, saw the police, saw the time was up, and ran out the back." The State noted that the footage from the liquor store where Jones took defendant depicted defendant in the same clothing observed on the body camera footage. The State further noted that defendant's DNA was found on multiple items in Jenkins' home, as well as Jenkins' body. The State further noted that Jenkins' DNA was found in Jones' car—a car Jenkins had never been in. According to the State, Jenkins' DNA was found in Jones' car because defendant was "covered in her blood." The State additionally noted that defendant's fingerprint was found in blood on a notebook in Jenkins' bedroom.

¶ 43    The State then asked, "How else do we know that [defendant] was there and did this killing?" The State asserted that defendant's phone "puts him there. The GPS puts him at her house during those exact times. And he tells us what he's going to do" in his texts that stated, "You dead." The State also noted that Jones overheard defendant state that he "cracked" Jenkins and that

17

after Jenkins died, defendant never attempted to call her again because he knew she would not answer.

¶ 44　The State went on to argue that the evidence showed that defendant intended to kill or do great bodily harm, or knew that it would cause death, because he hit her "with a blunt object *** till it breaks, and then stab[ed her] with it," and set her on fire. The State also noted that defendant stomped on Jenkins, as evidenced by his bloody footprint on her skin, and defendant "stabbed her until she lost control of her bowels, and then he set her on fire. *** And we know she was still alive." The State added that defendant smothered Jenkins "to the point where her blood vessels burst."

¶ 45　With regard to the brutal and heinous element, the State asserted that it did not have to show the pictures to the jury again. The State claimed there was "no other definition of those pictures except exceptionally brutal, heinous behavior, indicative of wanton cruelty; her face, her head."

¶ 46　In defense counsel's closing argument, counsel admitted that what happened to Jenkins was horrific but asked the jury to pay attention to information it did not hear. Defense counsel noted that there was no evidence showing what caused the argument between defendant and Jenkins. Counsel also noted that it was reasonable for defendant's DNA and fingerprints to be found at the scene because Jenkins and defendant were dating. Defense counsel also noted that other unidentified DNA profiles were found at the crime scene and that the State failed to explain who "Bunk" was. Defense counsel further noted that defendant's clothes and shoes were never introduced into evidence and that no shoe comparison was ever made by law enforcement.

¶ 47    On April 21, 2022, the jury returned a verdict of guilty as to all four counts of murder. The jury also found that the murder was committed in an especially brutal and heinous manner, indicative of wanton cruelty.

¶ 48    On June 6, 2022, defendant filed a *pro se* motion for new trial. Shortly thereafter, on June 8, 2022, defense counsel filed a motion for acquittal or, in the alternative, motion for new trial. Defense counsel alleged, *inter alia*, that the court erred by failing to grant defendant's motion to bifurcate the trial and by admitting cell phone and location records over defendant's objection.

¶ 49    On June 15, 2022, the trial court held a sentencing hearing. At the outset, the court noted that counts II, III, and IV merged into count I for sentencing. For its evidence in aggravation, the State presented the testimony of one witness, Champaign County Sheriff's Deputy Kerolos Gabra. Gabra testified that he conducted a traffic stop on a vehicle at approximately 2:45 a.m. on December 25, 2019. Defendant was a passenger in the vehicle. During the stop, a firearm was located in the glove box of the vehicle. The driver of the vehicle denied ownership of the firearm and defendant was placed under arrest. Devon Craig, who was in federal custody on multiple counts of delivery of methamphetamine, posted bail for defendant. Following Gabra's testimony, friends and family members of Jenkins read victim impact statements. Defense counsel indicated that the defense did not "have any evidence in mitigation, only argument."

¶ 50    The State then presented argument. The State noted that defendant, who had multiple prior felony convictions, was arrested after he was caught with a firearm three months prior to Jenkins' murder. The State clarified that Devon Craig was defendant's brother. The State argued that it was "clear that [defendant] was mixed up with guns and drugs and that was his lifestyle." The State noted that "while out on bond in the gun case, [defendant] committed this horrific murder." The State maintained that there was no mitigation evidence but if there were some mitigating factors,

19

none should carry weight because of the overwhelming evidence and horrific nature of the crime. The State concluded, "Justice demands life in prison."

¶ 51    Defense counsel then presented argument. Defense counsel stated, "Your Honor, this is a hard position to be in. This is a tough case. We all heard the evidence. And, you know, I mean it when I say this, it was horrible. I'm sorry that [Jenkins] is not here, but we are here now to decide [defendant's] future." Defense counsel noted that defendant was 38 years old, and that any sentence, including the minimum of 20 years, would be significant. Defense counsel disagreed that there was no mitigation in the record, noting that defendant was a father who had a good relationship with his two daughters. Defense counsel noted that defendant had "to live with the guilt of what he's put his family through" and that his family did not show up to the trial, which was difficult for defendant. Defense counsel asked for a sentence of 30 years—the offer that was extended to defendant prior to trial. Defense counsel acknowledged that defendant had several felony convictions but noted that "7 of the 8" were for driving. Defense counsel stated, "This is not someone with, you know, an extensive criminal history." After defense counsel finished argument, defendant indicated that he would not make a statement in allocution.

¶ 52    The trial court stated that it considered the presentence investigation report (PSI), evidence in aggravation, the statutory mitigating and aggravating factors, along with the history and character of defendant. With regard to mitigation, the court noted that it did "not see any statutory mitigating evidence, although there is mitigation in the record." The court noted that defendant was a relatively young man with no prior history of violent crimes. The court acknowledged that most of defendant's criminal history related to traffic offenses. The court noted that defendant was capable of obtaining and maintaining employment, and that he had a good relationship with his

children. The court also noted that defendant acknowledged that he suffered from a drinking problem and that he drank a half pint of hard liquor on the night of the offense.

¶ 53    With regard to aggravation, the trial court found "some statutory aggravation [was] built into the conviction because of the *Apprendi* factor which was found by the jury." The court noted that the jury found the murder to be one of wanton cruelty, which obviated the need for the court to make a duplicative finding on that factor. The court noted that defendant had a history of prior criminal activity but noted that Gabra's testimony regarding defendant's possession of a firearm did not significantly change the court's judgment. The court provided a detailed account of the "horrific" acts that led to Jenkins' death. The court then stated:

> "The jury was persuaded that your murder of [Jenkins] was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. They were persuaded of this beyond a reasonable doubt because it was glaringly obvious that you terrorized and tortured Tenesha Jenkins to death. That makes you eligible for a natural life sentence. Reviewing the record before me, that is the appropriate punishment. This was no ordinary murder. It was an extraordinary murder. Extraordinary in its cruelty. The legislature has authorized this punishment for precisely this type of case. For these reasons, the court imposes a sentence of natural life imprisonment for your murder of Tenesha Jenkins."

The court also entered a written order sentencing defendant to natural life in prison on June 15, 2022.

¶ 54    On July 14, 2022, defendant filed a motion to reconsider sentence. Defendant argued that the trial court's natural life sentence was "not in keeping with the objectives of the Illinois Constitution." The motion alleged that the court "failed to adequately consider the impact of a sentence of life without parole on the defendant's family."

¶ 55    On August 9, 2022, following a hearing, the trial court denied defendant's motion to reconsider sentence. Defendant timely appealed. Additional facts will be provided as necessary throughout the remainder of this order.

21

¶ 56                                    II. Analysis

¶ 57    On appeal, defendant argues that (1) the trial court erred by denying his motion to bifurcate the guilt and sentencing phases of his trial pursuant to Illinois Supreme Court Rule 451(g) (eff. Apr. 8, 2013), (2) the court erred by admitting cell phone and location data records as self-authenticating business records, and (3) his natural life sentence is excessive. We address these arguments in turn.

¶ 58                              A. Motion to Bifurcate

¶ 59    Defendant argues that the trial court erred by denying his motion to bifurcate the trial to allow the jury to determine the issue of guilt and allow the court to determine the extended-term sentencing issue of whether the murder was committed in a brutal and heinous manner indicative of wanton cruelty. Defendant asserts that the court's refusal to bifurcate the trial prevented him from having a fair trial because the jury was "inundated with extremely sensitive and prejudicial evidence throughout the trial, which was unnecessary for the guilt phase of trial." We disagree.

¶ 60    Rule 451(g) provides, in pertinent part, as follows:

> "When the State intends, for the purpose of sentencing, to rely on one or more sentencing enhancement factors which are subject to the notice and proof requirements of section lll-3(c-5) of the Code of Criminal Procedure, the court may, within its discretion, conduct a unitary trial through verdict on the issue of guilt and on the issue of whether a sentencing enhancement factor exists. The court may also, within its discretion, upon motion of a party, conduct a bifurcated trial. In deciding whether to conduct such a bifurcated trial, the court must first hold a pretrial hearing to determine if proof of the sentencing enhancement factor is not relevant to the question of guilt or if undue prejudice outweighs the factor's probative value." Ill. S. Ct. R. 451(g) (eff. Apr. 8, 2013).

Because a bifurcated trial "generally causes additional inconvenience to the jury, the witnesses, and/or the parties, and causes additional cost to the parties and/or the taxpayers," the Committee Comments to Rule 451(g) make "unitary trials the presumptive option." Ill. S. Ct. R. 451(g),

22

Committee Comments. A trial court's ruling on a motion to bifurcate a trial is reviewed for an abuse of discretion. *People v. Weatherspoon*, 394 Ill. App. 3d 839, 855 (2009).

¶ 61    In the present case, we cannot say that the trial court abused its discretion by denying defendant's motion to bifurcate. Following a pretrial hearing, the court determined that the evidence associated with the sentence enhancement factor—that the murder was committed in a brutal and heinous manner indicative of wanton cruelty—was also relevant to the question of guilt. The State charged defendant with four counts of first degree murder, alleging that: defendant, "without lawful justification, and with the intent to kill or do great bodily harm to [Jenkins] battered and smothered her, thereby causing her death" (count I); defendant, "without lawful justification, battered and smothered [Jenkins], knowing said acts created a strong probability of death or great bodily harm to [Jenkins], thereby causing her death" (count II); defendant, "without lawful justification, battered and smothered [Jenkins], knowing said acts would cause the death of [Jenkins], thereby causing her death" (count III); and defendant, "without lawful justification, while committing a forcible felony, namely Home Invasion in violation of 720 ILCS 5/19-6(a)(2), battered and smothered [Jenkins], thereby causing the death of [Jenkins]" (count IV). The evidence regarding the superficial burns and lacerations Jenkins suffered prior to her death by smothering established great bodily harm and intent—elements the State was required to prove in its case in chief. Moreover, as the court noted, the State planned to present evidence to show different theories of murder and, thus, bifurcating the trial would put the State in a difficult position relative to some of its evidence showing motive to commit the act or the likelihood that defendant committed the act. Thus, the court properly determined that the evidence associated with the sentencing factor was also relevant to the question of guilt.

23

¶ 62    The trial court also rejected defendant's argument that undue prejudice from the evidence regarding the superficial burns and lacerations would outweigh its probative value.  We agree with the court that, while gruesome, the photographs and testimony regarding the injuries Jenkins suffered prior to her death explained to the jury what happened. See *People v. Henderson*, 142 Ill. 2d 258, 319 (1990) (photographs of a victim may be admitted to prove, *inter alia*, the nature and extent of injuries; the force needed to inflict injuries; the position, location, and condition of the body; the manner and cause of death; and to aid in understanding the testimony of a pathologist or other witness); see also *People v. Jones*, 236 Ill. App. 3d 244, 249 (1992) (although photographs may be cumulative of witness testimony describing the condition and location of a body, the photographs may aid jurors in understanding such testimony). We also note that the court limited the number of photographs the State could use at trial when it ruled on defendant's motion to bar unduly prejudicial evidence, in which defense counsel sought to bar the same evidence regarding the superficial burns and lacerations. The record reveals that the court thoroughly reviewed each photograph in ruling on the motion to bar unduly prejudicial evidence. We also note that the State declined to show the photographs again when discussing the brutal and heinous nature of the murder during closing arguments. Thus, we conclude that the court properly rejected defendant's argument that undue prejudice outweighed the factor's probative value.

¶ 63    Based on our review of the record, the trial court could have reasonably concluded that the evidence associated with the sentencing factor was also relevant to the question of guilt and that undue prejudice did not outweigh the factor's probative value. Thus, we hold that the court did not abuse its discretion by denying the motion to bifurcate.

¶ 64                    B. Cell Phone and Location Data Records

¶ 65    Defendant next argues that the trial court erred by admitting defendant's cell phone (T-Mobile) and location data records (Google and Google Maps) as self-authenticating business records and by allowing Officer Beckett to testify to the data contained in those records. Defendant maintains that the custodians' certifications of such records were not made under oath subject to the penalty of perjury, as required by Illinois Rule of Evidence 902(11) (eff. Sept. 28, 2018). The State concedes, and we agree, that the court erred by admitting the records and allowing the testimony. However, we also agree with the State that any error was harmless.

¶ 66    Rule 902(11) provides, in pertinent part, as follows:

> "Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

> * * *

> (11) Certified Records of Regularly Conducted Activity. The original or a duplicate of a record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written certification of its custodian or other qualified person that the record

> > (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters;

> > (B) was kept in the course of the regularly conducted activity; and

> > (C) was made by the regularly conducted activity as a regular practice.

> The word 'certification' as used in this subsection means with respect to a domestic record, a written declaration under oath subject to the penalty of perjury ***." *Id.*

This court generally reviews the trial court's ruling regarding the admissibility of evidence for an abuse of discretion. *People v. Cross*, 2021 IL App (4th) 190114, ¶ 126.

¶ 67    In the present case, the State concedes that "the certificates on their face do not comply with the requirements of Rule 902(11)." Specifically, the State concedes that neither certificate

25

included the phrase "under oath" as required by Rule 902(11). Accordingly, we conclude that the trial court abused its discretion by admitting the records and testimony where the certifications failed to include the phrase "under oath" as required by Rule 902(11). See *People v. Fox*, 2022 IL App (4th) 210262, ¶ 82 (concluding that the trial court erred by finding the certificates accompanying cell phone records complied with the requirements of Rule 902(11), where the certificates failed to include the words "under oath").

¶ 68 Despite this, we agree with the State's assertion that any error in the admission of the records and testimony was harmless. "[E]ven if the trial court has committed an abuse of discretion in the admission of evidence, it will not warrant a reversal of the trial court's judgment unless the record indicates the existence of substantial prejudice affecting the outcome of the trial." *People v. Brown*, 2021 IL App (3d) 170621, ¶ 33. An evidentiary error is harmless "where there is no *reasonable probability* that the jury would have acquitted the defendant absent the error." (Emphasis in original and internal quotation marks omitted.) *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104. When determining whether error is harmless, the reviewing court may:

> "(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *People v. Becker*, 239 Ill. 2d 215, 240 (2010).

This court may affirm on any ground supported by the record. See *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 27 ("Although the State did not point to either of these facts in its arguments about the sufficiency of the evidence, we of course may affirm on any ground supported by the record.").

¶ 69 In the present case, we agree with the State that there was no reasonable probability that the jury would have acquitted defendant if the trial court had excluded the records and not allowed

the testimony pertaining to such records. Specifically, we agree that the remaining, properly admitted evidence of defendant's guilt was overwhelming.

¶ 70    The testimony of Gipson and the surveillance footage established that defendant, Gipson, and Jenkins went to a bar together on the evening of February 22, 2020. Gipson testified that defendant and Jenkins were in a relationship at that time. The surveillance footage demonstrated that defendant left the bar before Jenkins and Gipson left at 1:59 a.m. on February 23, 2020. Gipson testified that defendant and Jenkins were involved in an argument in a parking lot outside the bar which resulted in defendant tossing Jenkins' wig into the parking lot after removing the wig from Jenkins' head. The surveillance footage confirmed that an individual approached Jenkins' car and twice tossed what appeared to be a yellow wig into the parking lot. After this exchange, Jenkins and Gipson left together in Jenkins' car. Gipson testified that Jenkins was upset and embarrassed about the confrontation, so Gipson drove Jenkins home. Gipson dropped Jenkins off at Jenkins' home and drove Jenkins' car to her own home, telling Jenkins that she would return the car later that morning.

¶ 71    Gipson testified that she attempted to call and text Jenkins later that morning but received no response, so Gipson drove to Jenkins' home and went inside. Gipson saw defendant standing in the kitchen and hallway area. Defendant was wearing a blue sweater with some writing and blue jeans. Gipson also observed that there were broken items all over Jenkins' home. Defendant told Gipson that Jenkins was sleeping. Gipson felt as though something was wrong, so she called one of Jenkins' relatives and then 9-1-1.

¶ 72    Officer Ferriman testified that he responded to a welfare check at Jenkins' home at around noon on February 23, 2020. Ferriman heard movement inside the home when he knocked on the door. Ferriman observed a Black male in a navy-blue zip-up jacket with the letters "NAU" on the

27

arm through a frosted glass door window. Ferriman also observed broken glass inside the home. Ferriman heard a screen door slam from behind the house but was unable to locate the individual he observed inside the home. Ferriman walked into the home and observed all four stove burners set on high, so he turned them off. After Sergeant Vercler arrived, both officers swept the home. The officers observed damage to the front door, which appeared to have been kicked or pushed in. The officers also observed broken items and glass throughout the home. The officers also discovered Jenkins' body lying nude on a bed in a bedroom. The officers' body camera footage was played for the jury at trial, including the footage of the individual Officer Ferriman observed through the frosted glass window of the front door of Jenkins' home.

¶ 73    Detective Wakefield's testimony, along with additional surveillance footage, demonstrated that an individual matching a description of the individual Officer Ferriman observed in Jenkins' home appeared near an apartment complex in Jenkins' neighborhood. The footage also showed the individual get into a vehicle. Detective Wakefield was able to track down the owner of the car, Jones, who testified at trial. Jones testified that she picked up defendant at the apartment complex near Jenkins' home, which surveillance footage confirmed. Jones also confirmed that she overheard defendant state that "he had got into it with her," that he "cracked her," and that she was "at the house asleep." Jones also observed dark stains on defendant's shoes. Jones provided additional information to law enforcement as to where defendant traveled after leaving Jenkins' home. Surveillance footage supported the information Jones provided to law enforcement.

¶ 74    The State also presented the testimony of Dr. Srinivasan, who testified that DNA found in Jones' car matched Jenkins' DNA. Dr. Srinivasan also testified that defendant's DNA was found on multiple items in Jenkins' home, including a cigarette butt, Jenkins' hip, Jenkins' ankle, a broom handle, and a notebook. In addition, the State presented the testimony of Long, who testified

28

that defendant's fingerprint matched a bloody fingerprint found on a notebook in Jenkins' bedroom.

¶ 75    Detective Wakefield also testified that he obtained the PIN for Jenkins' cell phone which was recovered at the scene. Photographs taken of a text message exchange between Jenkins and a contact listed as "Antoine" indicated that Jenkins received the following texts from "Antoine" at 3:15 a.m.: "Bye bitch," "Dick sucjer," "Fake hoe who do dicks lol," "U just something to do with yo mouth," and "I just want my money u dead hoe." The photographs of Jenkins' cell phone depicting these text messages were admitted into evidence by stipulation. Defendant does not allege that counsel was ineffective for stipulating to the admission of this evidence.

¶ 76    We acknowledge that the State relied on the cell phone records and location data in its closing argument; however, the State also highlighted additional evidence in its closing argument that supported defendant's guilt. Notably, the State relied on Gipson's testimony and surveillance footage, which showed that defendant went to a bar with Jenkins and Gipson from approximately 12 a.m. to 2 a.m. and that he was involved in an argument with her in the parking lot after leaving the bar. As noted, the defense stipulated to the admission of the photographs taken of Jenkins' cell phone screen, which indicated that she and a contact listed as "Antoine"—defendant's name— exchanged phone calls and text messages. The last text message Jenkins received from "Antoine" stated, "I just want my money u dead hoe." The last phone call Jenkins received from "Antoine" was at 3:25 a.m. on February 23, 2020. The State highlighted Gipson's testimony that she saw defendant at Jenkins' home when she attempted to return Jenkins' car later that morning. Gipson testified that defendant was wearing a blue sweatshirt and jeans, while Officer Ferriman observed an individual in a blue sweater when he arrived to conduct a welfare check at Jenkins' home at approximately noon on February 23, 2020. The State played for the jury Officer Ferriman's body

29

camera footage, which depicted the individual matching this description in Jenkins' home. Surveillance footage showed an individual matching this description getting into a vehicle at an apartment complex near Jenkins' home shortly before noon on February 23, 2020. Jones testified that she picked up defendant at the apartment complex near Jenkins' home at that time. The State also played for the jury surveillance footage from the liquor store where Jones took defendant, which depicted defendant wearing a blue sweatshirt and jeans. Thus, although the State discussed the cell phone and location data records in its closing argument, the State highlighted additional evidence that demonstrated defendant's whereabouts from approximately 12 a.m. to the time Jenkins' body was discovered by law enforcement on February 23, 2020. The State also highlighted the DNA evidence showing that defendant's DNA was found in Jenkins' home and that Jenkins' DNA was found in Jones' car.

¶ 77    Based on our review of the record, we conclude that the properly admitted evidence of defendant's guilt was overwhelming. Thus, we hold that the erroneous admission of the testimony and records did not substantially prejudice defendant and affect the outcome of the trial so as to warrant reversal and remand for new trial in this case.

¶ 78                                          C. Excessive Sentence

¶ 79    Lastly, defendant argues that his life sentence is excessive given the mitigating factors, including his lack of a violent criminal history, his close relationship with his two adult children, and his ability to maintain employment. We disagree.

¶ 80    The trial court has broad discretionary powers in imposing a sentence, and the court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The trial court is granted such deference because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence. *Id.* The trial court "has the

30

opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.* (citing *People v. Streit*, 142 Ill. 2d 13, 19 (1991); *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977)). Accordingly, this court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *Id.* (citing *Streit*, 142 Ill. 2d at 19).

¶ 81    Applying these principles to the present case, we cannot say that the trial court abused its discretion in sentencing defendant to natural life in prison. The court specifically stated that it considered the factors in aggravation and mitigation, along with the history and character of defendant, in sentencing defendant. The court specifically stated that it considered defendant's lack of violent criminal history, his relationship with his children, and his ability to maintain employment. However, the court placed greater weight on the factors in aggravation, including the brutal and heinous nature of defendant's crime. The court provided detailed reasoning in support of its decision to sentence defendant to natural life in prison. We decline defendant's invitation for this court to reweigh the evidence and substitute our judgment for that of the trial court. Based on the record before us, we hold that defendant's natural life sentence was not excessive.

¶ 82                                III. Conclusion

¶ 83    For the foregoing reasons, we affirm defendant's conviction and sentence.


¶ 84    Affirmed.